UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Mark Hendershott,                                          Case No. 3:16-cv-2009

          Plaintiff,

    v.                                                    MEMORANDUM OPINION


St. Luke's Hospital,

          Defendant.


## I.    INTRODUCTION

Plaintiff, Mark Hendershott, filed suit against Defendant St. Luke's Hospital ("SLH"),

alleging violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1),

the Americans with Disabilities Act (ADA), 42 U.S.C.A. § 12100 *et seq*, and Ohio law, O.R.C. §

4112.02. (Doc. No. 1). Before me is a motion for summary judgment filed by SLH. (Doc. No. 29).

Hendershott filed a memorandum in opposition, (Doc. No. 38), and SLH replied. (Doc. No. 39).

## II.    BACKGROUND

Mark Hendershott worked in the respiratory department of St. Luke's Hospital from 1981 to

2015. (Doc. No. 1 at 1). In 2002, he became a night-shift supervisor. (*Id.*). He held that position

until his employment was terminated in May 2015. (*Id.*). Hendershott was 56 years old when SLH

terminated his employment. (*Id.*).

### A.  Hendershott's History at St. Luke's Hospital

According to SLH, there were no significant issues with Hendershott's work performance

until 2012, when his supervisor, Annette Greenhagen, began receiving complaints from respiratory

therapists under Hendershott's supervision. (Doc. No. 29 at 7). These complaints alleged Hendershott was unprofessional, inappropriately intimidated his subordinates, and failed to communicate with them effectively. (Doc. Nos. 24-4, 24-5, 24-9, 24-10, & 24-11).

After receiving these complaints, Greenhagen wrote an email to Theresa Konwinski, the Vice President of Patient Care Services at SLH, on June 26, 2012. (Doc. No. 24-12). Greenhagen copied Administrative Nursing Director Donna Tennant and Director of Human Resources Connie Sessler on this email. In the email, Greenhagen relayed the information she had received from Hendershott's employees and stated, "Mark is a very long term, good employee, but has had some mental health issues in the past." (Doc. No. 24-12 at 1-2). Greenhagen then recommended Hendershott be referred to Don Adamski, a Human Resources Consultant at SLH. (*Id.* at 2).

Greenhagen met informally with Hendershott to discuss these concerns at least two times before ultimately holding a coaching[1] with Hendershott on July 20, 2012. (Doc. No. 24-13). Despite this, problems within the department persisted. In August, Greenhagen received additional complaints that Hendershott was creating a hostile work environment. (Doc. No. 24-14). Hendershott, for his part, had his own complaints about the way the department was run in 2012.

Despite the problems throughout 2012, Hendershott was not subjected to formal discipline until 2013, when he was suspended for one day for using profanity at work to describe a coworker. (Doc. No. 23-3). The disciplinary action also required Hendershott to see Adamski. (Doc. No. 23-3). According to Hendershott, Adamski recommended he seek counseling for anger issues. (Doc. No. 24-1 at 23). Hendershott refused, telling Adamski that he did not have anger issues but did have a history of depression, for which he was already receiving treatment. (*Id.*).

---

[1] A coaching does not constitute formal disciplinary action, but rather is akin to "pre-discipline." (Doc. No. 20-1 at 28)

**B.  The May 10, 2015 Incident**

On May 10, 2015, a "code blue[2]" was called when a patient was brought into the emergency room at SLH in full respiratory arrest.  According to Tara Inman, a night-shift respiratory therapist at that time, Hendershott touched her inappropriately during this code blue.  In her deposition testimony, Inman stated the following:

> After I attempted to hand him an oxygen connection, a green hose hooked to the wall, and he shook his head, no.  I had to set it down because I was ambling a patient with one hand, and my hand was slipping.
>
> I was ambling with my right hand, and my hand was slipping, so I needed both hands.  So I set that down to amble with both hands.  And he came around to the back of me and reached around with his right arm across the front of me, and with his left arm across the back, his right arm was low and touching, grazed across my breasts, and held there while he did something with the ventilator that was hanging on an IV pole that was next to my head.

(Doc. No. 22-1 at 27).  Hendershott denies intentionally touching Inman in this manner.  (Doc. No. 24-1 at 24-27).

Two days later, on May 12, 2015, Inman reported the incident to Melissa Kukiela, Respiratory Therapy Manager and Hendershott's immediate supervisor at the time.  (Doc. No. 29 at 8).  Kukiela was relatively new in the department, having started at SLH in February 2015.  (Doc. No. 29-1 at 1).  Seeing that Inman was visibly shaken as she relayed what had happened, Kukiela decided to take the matter directly to the Director of Human Resources, Connie Sessler.  (Doc. No. 20-1 at 5).

Inman told both Kukiela and Sessler that Hendershott had touched her inappropriately during the code blue on May 10.  (Doc. Nos. 20-1 at 5 & 26-1 at 7).  Inman also told them about an incident on May 11, the first day that Inman and Hendershott had worked together following the May 10 incident, where Hendershott went out of his way to go to the Cardiovascular Unit to see

---

[2] Inman indicated that a code blue refers to when a patient is in cardiac arrest.  (Doc. No. 22-1 at 3).  Hendershott indicated that when a code occurs, it means someone is either not breathing or their heart has stopped.  (Doc. No. 24-1 at 24).

Inman.  (Doc. Nos. 20-7 at 2 & 26-12 at 8).  Inman told them Hendershott sat down across from her in an area of the hospital he did not have to go to and sat by her for several moments or minutes without speaking, making her uncomfortable.  (Doc. Nos. 20-1 at 6-7 & 26-1 at 7).  Hendershott denies purposely seeking out Inman on that occasion.  (Doc. No. 24-1 at 27).

Sessler and Kukiela further testified that Inman told them the May 10 incident was not the first time Hendershott had made her uncomfortable, though they did not go into detail beyond saying she found him intimidating.  (Doc. Nos. 26-1 at 7-8 & 20-7 at 2).[3]  Sessler did not press the issue or ask for more detail regarding why Inman found Hendershott intimidating because Sessler felt Inman was too visibly upset for such questions at the time.  (Doc. No. 26-1 at 8).

After meeting with Inman, Sessler and Kukiela met with Haley McClure, a respiratory therapist who had recently transferred from the night shift, where Hendershott was her supervisor, to the day shift.  (Doc. No. 20-1 at 8).  When asked about the overall tone of the night shift, McClure immediately began talking about Hendershott and some of the problems he had as a supervisor.  (Doc. No. 20-1 at 8).  Specifically, McClure told them Hendershott was intimidating as a supervisor and would sometimes refuse to answer the phone or offer the assistance she needed.  (*Id.*).

Kukiela testifies that she next went to Jean Sandrock, the director of the ER Department, and Cheryl Herr, a manager in the ER Department, to further investigate Inman's allegations.  (Doc. No. 20-1 at 8).  Kukiela asked them if they had heard about anything unusual happening in the ER on May 10 and, according to Kukiela, both said no.  (Doc. Nos. 20-1 at 8).  In her affidavit, Kukiela stated she asked those two "to inquire of the ED staff that was present for the code if they noticed anything unusual."  (Doc. No. 29-1 at 2).  Herr remembered being asked if she heard about anything

---

[3] Inman testified that she could not remember whether she told Sessler and Kukiela of any other occasions where Hendershott made her uncomfortable.  (Doc. No. 22-1 at 21).

unusual and indicating that she had not, but she did not remember if Kukiela had asked her to follow up with staff and ask if anything unusual occurred. (Doc. No. 21-1 at 2). Sandrock also could not remember whether she was asked to follow up with staff on this matter. (Doc. No. 32 at 8-9). For reasons discussed in greater depth later in this opinion, whether Kukiela in fact asked those two to inquire further with staff or not is immaterial. Kukiela did not think it was unusual for neither of them to have heard about anything regarding the May 10 code blue because she believed it was likely the nurses and others in the room were focused on the patient at the time rather than each other. (Doc. No. 29-1 at 2). SLH did not interview anyone regarding the code blue incident, but Sessler testified she would not have terminated Hendershott based solely on those allegations. (Doc. No. 26-1 at 11).

Sometime after meeting with Inman, Sessler and Kukiela met with Administrative Nursing Director Donna Tennant about what Inman had told them. (Doc. No. 23-1 at 9). According to Tennant, Sessler and Kukiela told her that the May 10 incident was not the first time that Hendershott had made respiratory therapists in the department feel uncomfortable. (Doc. Nos. 23-1 at 9 & 23-5 at 2). But Sessler and Kukiela did not mention by name who the other respiratory therapists were that felt this way, and Tennant did not ask. (Doc. No. 23-1 at 9).

The next step in SLH's investigation was to meet with Hendershott, which it did on May 18 after some scheduling difficulties with Hendershott. Sessler, Kukiela, and Tennant were all present at that meeting. The parties present different stories of how that meeting unfolded. According to SLH, Hendershott was uncooperative. He made it difficult to schedule the meeting, and then when the meeting occurred, he spent much of it saying he could not remember anything at all about the event. (Docs. No. 23-5 at 2 & 20-1 at 10-11 & 26-1 at 9). According to Hendershott, he was treated very rudely in the days leading up to the meeting and during the meeting itself. (Doc. No. 24-1 at 24-27).

After spending much of the meeting in silence, Hendershott eventually denied intentionally touching Inman in the way she alleged, and he asked for an opportunity to apologize to her. (Doc. No. 24-1 at 28). Hendershott stepping down from a supervisory role was also discussed at the meeting and Hendershott did not oppose the idea. (Doc. Nos. 23-5 at 2 & 24-1 at 29-30). By the time the meeting had concluded, the plan was for SLH to go forward with its investigation into Inman's allegations and for Hendershott and Inman to meet sometime in the coming days for his apology. Although Inman initially agreed to a meeting with Hendershott so that he could apologize, she changed her mind upon learning that she and Hendershott would be working together on the same shift after the meeting was to take place. (Doc. Nos. 22-1 at 15 & 20-1 at 10).

The investigation continued. On May 19, 2015, Kukiela was approached by Rachelle Johnson, the other respiratory therapist supervisors on the night shift at that time. (Doc. No. 20-1 at 11-12). According to Kukiela, Johnson told Kukiela that Inman had told Johnson what happened on May 10, and Johnson said there were other women on the night shift who were uncomfortable with or around Hendershott. (Doc. No. 20-1 at 11-12). Johnson said that Hendershott would ask women in the department for hugs and told Kukiela that another respiratory therapist, Savannah Hineline, once told Johnson that Hendershott had followed her home after work one time. (Doc. No. 20-7 at 4).

After hearing this, Kukiela reached out to Savannah Hineline, who confirmed what Johnson had told Kukiela and said Hendershott would ask her for foot rubs and stand over her and breathe in a way that made her uncomfortable. (Doc. Nos. 20-1 at 12-14 & 20-7 at 4). Kukiela asked Hineline why she had not reported these incidents, and Hineline told her she feared Anne Greenhagen would think she was simply retaliating against Hendershott for issues the two had in the past.

Following this conversation with Hineline, Kukiela called another respiratory therapist, Tatiana Kholodovych, who told Kukiela that she and Hendershott used to be friends but then he started making her uncomfortable. (Doc. Nos. 20-1 at 15 & 20-7 at 5). Kholodovych told Kukiela there were times that Hendershott would talk to her about foot rubs or hugs but that she would not know how to react because English was not her first language and she thought she might be taking the comments the wrong way. (Doc. No. 20-1 at 15).

Kukiela relayed what she was told by Johnson, Hineline, and Kholodovych to Sessler and Tennant later that same day, May 19. At some point on either May 18 or May 19, Hendershott was placed on paid administrative leave.[4]

On May 26, 2015, Sessler and Tennant continued the investigation by meeting in person with four employees: Savannah Hineline, Rachelle Johnson, Amanda Kohanski, and Haley McClure. (Doc. Nos. 26-1 at 12-13 & 23-1 at 10). Sessler and Tennant did not specifically mention Hendershott when they initially asked these employees about the "general tone" in the department during the night shift. (Doc. No. 26-12 at 4). Despite this, each of the four employees brought up Hendershott's name and they were generally consistent in their comments about him as a supervisor.

Hineline, Johnson, and McClure each said Hendershott would invade other employees' personal space. (Doc. No. 26-12 at 4-5). Hineline again said that Hendershott would ask her for foot rubs at work. (Doc. No. 26-12 at 4). Johnson told Sessler and Tennant that Hendershott often "blows up" on employees at work and that employees are afraid of him because of this. (Doc. No.

---

[4] In Hendershott's deposition, he indicates he was placed on paid administrative leave towards the conclusion of the May 18 meeting with Sessler, Kukiela, and Tennant. (Doc. No. 24-1 at 28). In Kukiela's deposition, she indicates that Hendershott was placed on administrative leave after Kukiela told Sessler about the phone calls Kukiela had with Hineline and Kholodovych. (Doc. No. 20-1 at 21). In her deposition, Sessler also indicates that Hendershott was placed on administrative leave on May 18, but at the same time she says the decision was made because some other people had come forward and Tennant and Sessler planned to further investigate the matter by speaking with them. (Doc. No. 26-1 at 10). Whether Hendershott was placed on administrative leave on May 18 or May 19 is not material to this suit.

26-12 at 4). Kohanski similarly said that employees had to walk on tiptoes around Hendershott and "learn to play his game" in order to avoid upsetting him. (Doc. No. 26-12 at 4). McClure reiterated many of the concerns she had shared with Kukiela, describing Hendershott as intimidating and explaining that employees were often afraid to stand up to him. Although none of these employees had these raised concerns about Hendershott prior to the May 10 incident, Sessler and Tennant concluded that this was because, as Kohanski told them, employees feared retaliation from Hendershott. (*Id.*).

### C. SLH terminates Hendershott's employment.

There are some inconsistencies in the record regarding who made the decision to terminate Hendershott's employment, when exactly the decision was made, and what ultimately convinced SLH that termination was appropriate.

What is clear is that the final disciplinary action memorandum was prepared by Sessler on May 27 and signed by Kukiela, Tennant, and Vice President Jill Trosin on May 28. The memorandum indicates that Hendershott was fired for inappropriate behavior. Although much of the memorandum refers to the problems the other respiratory employees reported, the memorandum also discussed the following as reasons for his termination: negativity and resistance to the changes being made in the department since Kukiela was brought in; Inman's allegations regarding the May 10 code blue; and Hendershott's lack of cooperation throughout the investigation. (Doc. No. 26-11 at 1-2).

According to Sessler, the decision was final on May 27, the same day that Sessler wrote a final disciplinary action memorandum detailing the reasons for Hendershott's termination. (Doc. No. 26-1 at 18). According to Sessler, she called Hendershott the evening of May 27, asked him to come meet with her at work on May 28 and mailed the termination letter on May 28 after Hendershott did not show up for the meeting. (Doc. No. 26-12 at 6).

According to Sessler, other than the May 18 meeting, SLH did not attempt to meet with Hendershott at any point before deciding to terminate his employment. (Doc. No. 26-1 at 18). But Kukiela's testimony differs from Sessler's characterization. She stated that the plan was for Hendershott to have the chance to come in and tell his side of the story in response to what was discovered in the May 26 conversations Sessler and Tennant had with Hineline, Johnson, McClure, and Kohanski. (Doc. No. 20-1 at 21-22). She explained: "If anything else would have come to light, I don't know what the outcome would have been, but he never showed up to talk to us about it." (*Id.* at 22).

Aside from the issues discussed above, Hendershott's job performance was generally positive. Hendershott received fifteen performance reviews during his time as a supervisor. (Doc. No. 38 at 11). In six of these, Hendershott received the highest rating an employee could at the time. (*Id.*) In all but one of the remaining reviews, Hendershott received the second highest rating. (*Id.*). In his most recent performance review, signed by Kukiela one month prior to his termination, Hendershott received a "5-Distinguished Contributor," the highest rating possible. (*Id.* at 12).

Hendershott received his termination letter on June 5, 2015. He filed his charge of discrimination with the Ohio Civil Rights Commission on June 26, 2015, and received a "right to sue" letter sometime after May 12, 2016. (Doc. No. 1 at 3).

### III.  STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## IV.    DISCUSSION

### A.    AGE DISCRIMINATION IN EMPLOYMENT ACT

The ADEA prohibits an employer from discharging an individual "because of such individual's age." 29 U.S.C. 623(a)(1). Ohio law similarly states that no employer shall "discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job." O.R.C. § 4112.14(A). Age discrimination claims brought under the Ohio statute are "'analyzed under the same standards as federal claims brought under the ADEA.'" *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Wharton v. Gorman-Rupp Co.*, 309 F. App'x 990, 995 (6th Cir. 2009)) (brackets omitted).

A plaintiff can prove a violation of the ADEA by either direct or circumstantial evidence. *Blizzard*, 698 F.3d at 283. When the plaintiff attempts to prove their case through circumstantial evidence, the claim is analyzed using the *McDonnell Douglas* burden-shifting framework. *Id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, the burden of production is first on the plaintiff to put forth a *prima facie* case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

If the employee does so, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 252. (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer does so, the employee "must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 252

(citing *McDonnell Douglas*, 411 U.S. at 804).  To survive a motion for summary judgment, the plaintiff "need not definitively prove that [the employer's] reason is pretextual, but rather 'must prove only enough to create a genuine issue as to whether the rationale is pretextual.'"  *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011)).

1.  **Hendershott's Prima Facie Case**

 To establish a *prima facie* ADEA discrimination case, Hendershott must show:

(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger worker.

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008).  SLH disputes only the fourth element.

The Sixth Circuit has held that "[a]n employer 'replaces' a discharged employee when it reassigns an existing employee to assume the discharged employee's duties in a way that 'fundamentally change[s] the nature of his employment.'"  *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 537 (6th Cir. 2014) (quoting *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir. 1997)).  "Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."  *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992).

Hendershott, who was 56 at the time of his termination, claims he was replaced by 43-year-old Tara Inman.  Around eight to nine months after Hendershott was fired, Tara Inman was promoted to a supervisory role that was essentially the same position as the one previously held by Hendershott.  (Doc. No. 22-1 at 12).  But SLH argues that, because Hendershott's supervisory duties were redistributed among the remaining night-shift respiratory therapists for eight months before Inman was promoted to the position, she did not replace him.

Although the gap between Hendershott's termination and Inman's promotion weakens the inference that Inman was his replacement, it does not defeat that inference entirely; it is only one

factor in a fact-intensive inquiry. Whether someone is a "replacement" for these purposes is a fact-sensitive inquiry that looks to more than just the timing of the new hire or promotion. *See e.g. Lilley*, 958 F.2d at 752 (holding a nine-month gap relevant but noting that the younger employee was brought in after an uptick in sales made hiring additional staff necessary); *Spreck v. Agrex*, 888 F. Supp. 2d 867, 878 (N.D. Ohio 2012) (finding a five-month gap was one of many relevant factors, including significant differences in pay and job responsibilities); *McDaniel v. Wal-Mart Stores, Inc.*, 94 F. Supp. 2d 878, 883 (N.D. Ohio 2000) (finding a six-month gap substantially weakened the inference but deciding the case on other grounds).

Here, Inman was promoted into a job that had the same responsibilities as Hendershott's previous position, with a change in title representing the only difference. SLH does not explain why they chose to eventually promote Inman, or anyone for that matter, rather than continue having the remaining night shift RRTs rotate as supervisor. Under these circumstances, a reasonable jury could conclude that, despite the lapse in time, Inman was Hendershott's replacement.

## 2. SLH's Legitimate Non-Discriminatory Reasons

Because Hendershott satisfied his *prima facie* burden, the burden shifts to SLH to state a legitimate, non-discriminatory reason for his termination.

In its motion for summary judgment, SLH stated: "Plaintiff was terminated after multiple employees came forward to management, reporting that Plaintiff acted inappropriately and was intimidating to female co-workers." (Doc. No. 29 at 19).

The final disciplinary action memorandum, prepared by Sessler on May 27, and signed by Kukiela, Tennant, and Vice President Jill Trosin on May 28, indicates that Hendershott was fired for inappropriate behavior. Although much of the memorandum refers to the problems the other respiratory employees had reported, the memorandum also discussed the following as reasons for his termination: negativity and resistance to the changes being made in the department since Kukiela

was brought in; Inman's allegations regarding the May 10 code blue; and Hendershott's lack of cooperation throughout the investigation. (Doc. No. 26-11 at 1-2).

Finally, I note that although the allegations regarding the May 10 incident occupy much attention, SLH, through Sessler, made clear that the May 10 code blue incident alone was not the basis for its decision to terminate Hendershott's employment. (Doc. No. 26-1 at 11). Instead, as Sessler explained, the report from Inman may have been a "contributing factor," but she would not have fired Hendershott based on that alone. (*Id.*).

### 3. Pretext

Hendershott contends each of these reasons are merely a pretext for discrimination. "Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

But these are not meant to operate as rigid categories, instead "[p]retext is a commonsense inquiry: did the employer fire the employer for the stated reason or not?" *Id.* at 400 n. 4. "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.* (citing *St. Mary's Honor Ctr.*, 509 U.S. at 515). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515.

Under the honest-belief rule, "an employer is entitled to 'summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless.'" *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591-92 (6th Cir. 2014) (quoting *Chen*, 580 F.3d at 401). "'[A]n employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made.'" *Seeger v. Cincinnati Bell*

*Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)) (original brackets omitted).

Thus, the question is not whether Hendershott *actually* committed the acts other SLH employees said he did, but instead whether the individuals involved in Hendershott's termination believed he did.  Hendershott attempts to show SLH officials could not have honestly believed the reasons they cite by pointing to various facts or alleged inconsistencies in the record.  But to succeed here, Hendershott must provide evidence from which a reasonable jury could conclude not just that SLH's reasons were wrong, but that they were so wrong they could not have been honestly held by SLH in the first place.

### a. Ambiguity Regarding Decision Maker(s)

As noted earlier, there is some confusion in the record regarding who exactly made the decision to terminate Hendershott's employment.  In their depositions, both Sessler and Tennant indicate that it was Sessler who ultimately made the decision to fire Hendershott.  (Doc. No. 26-1 at 17-18; Doc. No. 23-1 at 16).  But in their response to Plaintiff's interrogatories, Defendant states the decision to terminate Hendershott was made by Kukiela and Tennant, after the two of them consulted with Sessler.  (Doc. No. 27-10 at 5).  Kukiela herself also stated she was involved in the decision-making process.  (Doc. No. 20-1 at 24-25).

Hendershott claims this factual ambiguity shows pretext.  I disagree.  In *Roehrig v. W. G. Tomko, Inc.*, the ambiguity in the decision-making process was significant because the defendant failed to "identify who actually decided to terminate [the] plaintiff."  2016 WL 2755177, at *3 (W. D. Pa. May 12, 2016).  This is a problem because without knowing who actually made the decision, a factfinder cannot evaluate the employer's true motivation—which is what the pretext analysis is all about.

This case is different. Here, Hendershott claims SLH has identified too many decision-makers. Any problem this creates can be addressed by assuming, as I have here, that all of these individuals played some role in the decision and then asking whether Hendershott has put forth evidence from which a reasonable jury could find that any one of them intentionally discriminated against Hendershott.

Whether it was Kukiela, Sessler, Tennant, or some combination of the three, the decision to terminate Hendershott's employment was based on an investigation into allegations of misconduct that led SLH officials to believe Hendershott inappropriately exploited his authority as a supervisor in a manner that warranted termination. Who exactly made the decision may be a genuine dispute, but it is not a material one.

### b. Inman and Hendershott's Relationship Prior to May 10, 2015

Hendershott first relies on an apparent inconsistency between Inman's deposition testimony and the affidavits submitted by Sessler, Kukiela, and Tennant. (Doc. No. 38 at 61). He claims that Inman denied telling Sessler anything negative about Hendershott related to events prior to May 10, 2015. This is not true. Although Inman testified in her deposition that there was only one other time prior to the code blue where she had issues with Hendershott,[5] she did not deny telling Sessler otherwise during their meeting. (Doc. No. 22-1 at 21). Even if it was true that Hendershott had never made Inman feel uncomfortable in the past, the pertinent inquiry is whether Sessler, Kukiela, and Tennant believed otherwise. Sessler's notes from the meeting, which indicate that Inman told her Hendershott "has always creeped her out," demonstrate that they did. (Doc. No. 26-10). Hendershott presents no evidence that calls into question the belief reflected in these notes. The

---

[5] Inman testified that Hendershott offered her a cooking pan but that she did not accept because it was an expensive cooking pan and she felt it was inappropriate to accept that kind of gift from a coworker. (Doc. No. 22-1 at 21).

mere fact that, years later, Inman cannot remember whether she mentioned other incidents or not is not enough for a reasonable jury to conclude SLH officials believed she did.

### c. Adequacy of Investigation into Inman's Allegations

Hendershott next argues, to the extent the May 10 incident was a factor, "there is a material issue of fact as to whether a reasonable and informed decision was made." (Doc. No. 38 at 61). I take Hendershott's argument to be that SLH made a "decision" that he committed the acts alleged, and that this decision was unreasonable and uninformed.

First, I note that Sessler testified that SLH did not terminate Hendershott because of the May 10 incident. (Doc. No. 26-1 at 11). They called Hendershott in for a meeting to hear his side of the story. Although Hendershott denied the allegations, SLH supervisors believed his behavior during that meeting was suspicious. Still, they did not decide that warranted termination either. Instead, the allegations coupled with Hendershott's behavior during this meeting served as the basis for SLH's decision to investigate him further, which they did by speaking to numerous other SLH employees who had worked with or for Hendershott on the night shift. It was only after the second investigation that SLH decided to terminate his employment. Thus, it is not clear that, at the time SLH chose to fire Hendershott, it "decided" that he did in fact commit the acts Inman alleged he did.

But even if the May 10 allegations did influence the decision to fire him, Hendershott still fails to present any evidence those allegations were used as pretext for intentional discrimination.

Whether an employer honestly believed the basis for their decision is "necessarily tied to the nature of [the employer's] investigation and disciplinary decision process." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012). "An employer's pre-termination investigation need not be perfect in order to pass muster under the [honest belief] rule." *Loyd*, 766 F.3d at 591. The employer does not have to show that its decision-making process was "optimal or that it left no stone unturned.

Rather, the key inquiry is whether the employer made a reasonably informed and considered decision…." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

Hendershott claims SLH's investigation was so inadequate that they could not have honestly believed the facts their decision was based upon. Although the employer's failure to collect relevant evidence may be indicative of pretext, that failure alone does not categorically prevent employers from the protection the honest-belief rule affords. *See e.g. Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 407 (7th Cir. 2007) ("This is not to say that merely pointing to an employer's shoddy investigatory efforts is sufficient to establish pretext."). Instead, the employee must show that a reasonable jury could, based on the failure to conduct a deeper investigation, conclude that the investigation was a sham. Hendershott fails to do so here.

SLH conducted enough of an investigation into Inman's allegations to preclude any inference that SLH used the allegations as a cover for intentional discrimination. SLH officials did not rely on Inman's story alone. Instead, Kukiela asked emergency room management personnel if anyone had come forward to report anything that happened during the code blue, and they indicated no one had. Kukiela explained why, despite this, she thought the allegations could be credible: because code situations are emergencies and one would expect everyone's attention to be directed to the patient. (Doc. No. 29-1 at 2). Perhaps she was mistaken in that belief, and someone else could have provided more information, but even if that were the case that would not support an inference that Kukiela did not honestly hold that belief.

Further, as detailed above, it is not as if Kukiela's next action was to immediately terminate Hendershott's employment. Instead, the investigation continued through other avenues: Kukiela, Sessler, and Tennant met with Hendershott on May 18, finding him uncooperative and difficult to believe; Kukiela spoke with Johnson, Hineline, and Kholodovych, who all presented consistent and disturbing stories of Hendershott's behavior at work; Sessler and Tennant met with Hineline,

Johnson, Kohanski, and McClure, whose stories contribute to the troubling picture that had been painted thus far.

Finally, Hendershott's argument lacks the kind of supporting facts that would allow a reasonable jury to conclude that any deficiencies in the investigation are indicative of discrimination. For example, Hendershott has not identified any other similarly situated employees, that is, employees who accused of similar misconduct, who received a more thorough or comprehensive investigation than he did.

Hendershott raises similar arguments about the adequacy of SLH's investigation into the allegations of inappropriate behavior made by the other SLH employees to Kukiela, Sessler, and Tennant. The attack here fails for many of the same reasons as his arguments directed at Inman's allegations: SLH conducted enough of an investigation to reasonably and honestly believe that Hendershott regularly engaged in inappropriate behavior that justified termination. Kukiela spoke with Johnson, Hineline, and Kholodovych, all of whom told her Hendershott's behavior made employees uncomfortable. Sessler and Tennant continued the investigation by speaking to Hineline, Johnson, Kohanski, and McClure. The stories these employees told Sessler and Tennant were consistent in their portrayal of Hendershott and understandably caused Sessler and Tennant great concern. Hendershott has not presented anything to refute SLH's claim that Sessler, Kukiela, and Tennant honestly believed Hendershott was behaving inappropriately in a way that warranted termination.

### d. Failure to Follow Policy

Hendershott further claims SLH's failure to follow the steps laid out in their "No Discrimination" policy demonstrates pretext. (Doc. No. 38 at 63). Specifically, Hendershott claims SLH failed to comply with the "Investigation Procedures," which provide that "[i]ndividual(s)

alleged to have committed harassment have the right to be presented with the allegations and have a responsibility and a right to respond to the allegations."[6]  (Doc. No. 26-4)

Hendershott is correct that an employer failing to follow their own policy can be evidence of pretext, but an employer's failure to follow policy is not enough on its own to establish pretext.  *See Norton v. LTCH*, 620 F. App'x 408, 412-13 (6th Cir. 2015) (citing *Marshall v. Belmont Cnty. Bd. Of Comm'rs*, 110 F. Supp. 3d 780, 791 (S.D. Ohio 2015)).  The probative value of the failure to follow policy is stronger when the policy is one that governs termination or demotion.  *Marshall*, 110 F. Supp. 3d at 791.

Here, Hendershott fails to provide the kind of supporting evidence that a reasonable jury would need to conclude that SLH's failure to follow its policy was pretext for intentional discrimination.  In each of the cases Hendershott relies upon, the plaintiff was able to show that the way in which the employer strayed from their policy was itself suspicious.  *See e.g. Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 116 (6th Cir. 2007) (the failure to follow policy was bolstered by direct evidence from one of the employer's officials, who stated he was tired of letting young talent go and planned to go after the group of older employees); *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 393 (6th Cir. 2005) (holding the plaintiff presented "perhaps the minimal amount of circumstantial evidence needed to survive summary judgment" where the failure to follow policy was bolstered by evidence that: the employer generally did follow said policy; the termination decision came shortly after the employee disclosed her pregnancy; the employees supervisory skills were never questioned until she announced her pregnancy).

---

[6] Whether Hendershott was given any opportunity to respond to the allegations made by Johnson, Hineline, Kholodovych, Kohanski, and McClure is not entirely clear from the record.  Kukiela's deposition indicates that he would have had the opportunity had he been more cooperative when SLH was trying to set up another meeting.  Still, because this is at the summary judgment stage, I proceed by assuming Hendershott was not given any opportunity to respond to those allegations.

Further, the policy Hendershott cites is not concerned primarily with terminating or demoting employees—it sets forth procedures for investigating alleged misconduct. Further, unlike the situation in *DeBoer*, where the timing of the action was suspicious because it occurred shortly after the plaintiff disclosed her pregnancy, it is not as if SLH just became aware of Hendershott's age shortly before terminating his employment. Even while taking all facts in his favor, I conclude that no reasonable jury could find that the failure to follow policy in this case indicates that SLH intentionally discriminated against Hendershott on the basis of age or disability.

### e. Hendershott's Job Performance

Hendershott next argues that SLH's reasons must be pretext given his consistently positive performance evaluations during the time he worked there. (Doc. No. 38 at 63-65). Here, Hendershott complains that the Disciplinary Action which informed him of his termination "paints a poor picture…in the very first paragraph" despite evidence showing he performed his job duties in a consistently outstanding matter. (*Id.* at 63-64).

The Disciplinary Action claimed that Hendershott's ability to effectively lead night shift staff had been an area of concern for Kukiela for some time. (Doc. No. 26-11 at 1). Specifically, it claimed his "lack of follow through in attending mandatory meetings…negativity and resistance to changes made in the department…and overall lack of respect were troubling." (*Id.*). It concluded that Hendershott was not committed to the goals Kukiela had set since coming on as his supervisor in February of that year.

Hendershott is correct that the Disciplinary Action's introductory paragraph is at odds with the performance reviews he received leading up to his termination, particularly his most recent review which awarded him the highest possible rating and was signed by Kukiela. But the inconsistency between his prior performance reviews and the story told in the introductory paragraph of the Disciplinary Action is not sufficiently probative evidence of pretext.

First, as noted by SLH, whether the introductory paragraph of the Disciplinary Action falsely painted Hendershott in a bad light or not is immaterial to the current dispute. Hendershott was not fired for any of the reasons mentioned in the opening paragraph of the Disciplinary Action. He was fired because the investigation into Inman's allegations led SLH to believe Hendershott was behaving in a manner warranting termination. The Disciplinary Action itself defines the incident that led to termination as: "Class I – Exploitation of Supervisory Authority in relation to Subordinates and Co-Workers." (Doc. No. 26-11 at 1). The bulk of the Disciplinary Action is directed at Inman's allegations regarding the May 10 code blue and the investigation that followed. The second investigation led SLH officials to believe Hendershott was bullying other employees, a belief which justifies firing him regardless of his job performance otherwise.

Second, the positive performance reviews were all completed before SLH had any indication that Hendershott was engaging in the behavior for which he was fired. *See Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 506 (7th Cir. 2017) (explaining that earlier positive evaluations "cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken.") (further citation omitted).

As Hendershott points out, none of the employees reported him for the conduct that led to his firing until May 2015. Because there is no evidence that Kukiela, Sessler, or Tennant, at the time the positive performance reviews were completed, were aware that Hendershott engaged in this behavior, no reasonable jury could conclude that the performance reviews are inconsistent with Kukiela, Sessler, and Tennant honestly believing the stories they heard from other SLH employees.

**f. Inman's Promotion Following Hendershott's Termination**

Hendershott claims that Inman's eventual benefit from his termination in the form of her ultimate promotion is evidence of pretext. (Doc. No. 38 at 68-69). Again, his argument is defeated by the honest-belief rule. I recognize that Inman being the one to ultimately benefit from his

termination might, all else being equal, make it more likely that she would lie about what happened during the May 10 code blue to bring about his termination. But that does not mean SLH officials like Kukiela, Sessler, or Tennant would have any reason to think Inman was lying as part of some plan to take Hendershott's position. Inman's ultimate promotion does nothing to change my conclusion that Kukiela, Sessler, and Tennant all honestly believed that Hendershott engaged in inappropriate behavior at work.

### 4. Conclusion

Although Hendershott met his *prima facie* burden, SLH is entitled to summary judgment on this claim because Hendershott failed to show SLH's legitimate reasons were a pretext for age discrimination.

### B. AMERICANS WITH DISABILITIES ACT

Hendershott testified to being diagnosed with both depression and Obsessive-Compulsive Disorder (OCD). (Doc. No. 24-1 at 4). He claims the OCD and depression work synergistically, making the symptoms of each more pronounced. (Doc. No. 38 at 9). He was formally diagnosed with depression in 1992. (Doc. No. 24-1 at 4). He has received regular treatment from a psychiatrist since 1994. (*Id.*). In 2004, Hendershott took leave under the Family Medical Leave Act after he was hospitalized due to depression. (Doc. No. 24-2). The form granting his leave request was filled out by Rick Frame, his supervisor at the time, who is no longer with SLH. Hendershott was granted leave from November 18, 2004 to November 27, 2004. (Doc. No. 24-2). In 2013, shortly after his one-day suspension, Hendershott again took FMLA leave. To process his request, Greenhagen filled out a form entitled "Supervisor's Report of Request for Family and Medical Leave of Absence When Leave is NOT Foreseeable," which indicated that he had "[a] serious health condition that makes [him] unable to perform the essential functions of [his] job." (Doc. No. 28-21 at 1). The form also listed the reason for his leave as "Emotional/Mental Issues." (*Id.*).

In connection with this, SLH received a letter from Hendershott's psychiatrist, Dr. Shahid, dated February 1, 2013, which stated: "Mr. Hendershott was seen in the office today. Patient is advised to have time off from work, from February 1, 2013 to February 15, 2015. Patient can return to work on February 15, 2013." (*Id.* at 2). SLH also received a three-page FMLA form regarding this time off completed by Dr. Shadid. (*Id.* at 3-5). Hendershott was granted leave from February 2, 2013 to February 15, 2013. (Doc. No. 28-21 at 1).

## 1. Hendershott's Prima Facie Case

Because Hendershott seeks to prove his ADA discrimination claim through circumstantial evidence, he must show that:

> (1) he [ ] is disabled, (2) he [ ] is otherwise qualified for the position, with or without reasonable accommodation, (3) he [ ] suffered an adverse employment decision, (4) [SLH] knew or had reason to know of [his] disability, and (5) the position remained open while [SLH] sought other applicants or [he] was replaced.

*Ferrari v. Ford Motor Co.*, 826, F.3d 885, 891-92 (6th Cir. 2016). SLH contends the first and fourth prongs are not met. (Doc. No. 39).

### a. "Disabled" under the ADA

There is no dispute that Hendershott will be considered "disabled" under the ADA if he has: "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(2). SLH claims Hendershott is not "disabled" because neither his depression nor his OCD are considered an "impairment" under the ADA and, even if either was, neither "substantially limits" any major life activity. (Doc. No. 29 at 25).

SLH argues Hendershott's depression is not an impairment because it did not substantially limit any major life activity because it did not affect his ability to work, see, hear, speak, breathe, or learn. (Doc. Nos. 29 at 25; Doc. No. 24-1 at 39). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). Included in the definition of "mental impairment" is any "emotional or mental illness." 29 C.F.R. §

1630.2(h)(2). Because Hendershott has submitted evidence of his "emotional or mental illness" of depression, the only question that remains is whether this impairment substantially limits a major life activity when active.

"The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(i). Rather,

> An impairment is a disability…if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

29 C.F.R. § 1630.2(j)(ii). Examples of the "major life activities" include: "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

SLH's argument fails because, as both common sense and Hendershott's medical treatment records indicate, depression is an impairment that substantially limits many major life activities when active. At one point, Hendershott was hospitalized every year for depression for a three to four-year period. (Doc. No. 24-1 at 7). I do not have to look any further than the times Hendershott was unable to work because he was hospitalized for his symptoms. (Doc. No. 24-1 at 5-7; Doc. No. 28-21). A reasonable jury could find that these hospitalizations show that when his illnesses are active, Hendershott is substantially limited—as compared to most people in the general population—in his ability to perform life activities such as learning, thinking, and working.[7]

---

[7] Because I find Hendershott has shown enough for a reasonable jury to conclude he meets the definition of "disabled" under the first prong of the ADA, I do not need to address the remaining arguments he offers to show the ADA applies.

### b. SLH's Knowledge

The next issue is whether a reasonable jury could find that SLH knew or had reason to know of Hendershott's disability. As discussed above, because there is some dispute over who made the ultimate decision to terminate his employment, Hendershott can satisfy this element by showing Sessler, Kukiela, *or* Tennant knew or should have known he was disabled.

Hendershott offers four arguments to show SLH had knowledge of his disability: (1) Tennant and Sessler were copied on the June 2012 memorandum where Greenhagen wrote that Hendershott "has had some mental health issues in the past" and recommended that Hendershott see SLH's employee assistance counselor; (2) Kukiela's testimony that in May 2015, Kholodovych told Kukiela that Kholodovych heard Hendershott was mentally unstable; (3) Sessler's testimony that she saw Hendershott's 2013 leave forms while preparing for this litigation; (4) Sessler worked in the payroll department and had access to the FMLA leave forms Hendershott submitted from 2003 to 2005. (Doc. No. 38 at 76-77).

First, I agree with SLH that the fact Tennant and Sessler were copied on the June 2012 memorandum which said Hendershott "has had some mental health issues in the past" is not enough on its own. There is no evidence that either of them actually read that memorandum. Sessler testified that she did not because it was not something she would have been expected to handle. (Doc. No. 26-1 at 22-23). Also, even if she had, the memorandum does not mention depression or OCD or indicate what "mental health issues" Hendershott might have had. *See Brown v. BRK Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004) ("Knowing that an employee has health problems, however, is not the same as knowing that the employee suffers from a disability.").

Second, although Kholodovych did tell Kukiela she heard rumors that Hendershott was "mentally unstable," this kind of second-hand information is not enough to suggest Kukiela knew or

should have known that Hendershott was disabled.  Again, knowing that an employee is considered "mentally unstable" is different from knowing that employee suffers from depression.  Kukiela, who had only been working at SLH for a few months, saw Hendershott as a capable employee for much of the time they both worked there and would have had no reason to conclude he must have had a disability.

Third, Sessler's testimony that she eventually saw Hendershott's 2013 leave forms when compiling them for this litigation does not speak to whether she had knowledge of his disability at the time of his termination.  Sessler also testified that it was not her responsibility to approve leave forms at that time.  (Doc. No. 29-2 at 2).

As to the last instance Hendershott's identifies, I find Sessler's prior work in the payroll department that processed Hendershott's FMLA leave forms from 2003 to 2005 provides enough evidence for a reasonable jury to conclude Sessler should have known he was disabled.  In her affidavit, Sessler states that she reviewed leave paperwork which indicated Hendershott was taking leave for "depression." (Doc. No. 29-2 at 2).  Although Sessler attributed this to the divorce Hendershott was going through in 2005, and she said she did not believe he was still dealing with symptoms in 2015, a reasonable jury could find this is enough to conclude she should have known he was disabled.

### c.  Hendershott was replaced

Finally, while SLH does not address this point, I note that I have already concluded a reasonable jury could find that Tara Inman was Hendershott's replacement.  *See Dunn v. Chattanooga Pub. Co.*, 993 F. Supp. 2d 830, 836-37 (E.D. Tenn. 2014) (applying ADEA case law to analyze claim under the ADA); *See also* Section IV.A.1.  Inman is not disabled.

Further, this aspect of the *prima facie* case under the ADA is slightly distinct from the replacement issue under the ADEA because a plaintiff can meet this requirement by showing that

the position remained open while the employer sought other applicants. *Dunn*, F. Supp. 2d at 836-37. Therefore, Hendershott satisfies this element on other grounds as well: because Inman was not promoted to the position for nine months, a reasonable jury could conclude that SLH held the position open while it sought other applicants.

### 2. Pretext

The same legitimate, non-discriminatory reasons that SLH relied on in the ADEA context apply to Hendershott's claims for disability discrimination. I have already found that Hendershott has failed to establish that a reasonable jury could find those claims were pretext for intentional discrimination. Hendershott submits one additional argument regarding pretext that pertains specifically to disability discrimination. Here, he argues that while SLH contends they fired him because of his behavior, that behavior is actually caused by his depression and therefore, they fired him because of his depression.

Specifically, Hendershott testified "they terminated me because they said I was rude, and that's a direct tie to [my depression]." (Doc. No. 24-1 at 33). But courts have held that employers are permitted to "terminate an employee for inappropriate behavior even when that behavior is precipitated by the employee's disability." *Monroe*, 871 F.3d at 506-07 (quoting *Felix v. Wis. Dep't of Transp.*, 828 F.3d 560, 574 (7th Cir. 2016)). Therefore, even if Hendershott could show that they terminated his employment because of behavior that was traceable to his depression, that showing would not serve as evidence that the firing was pretext for intentional discrimination in violation of the ADA.

### C. STATE LAW EMPLOYMENT DISCRIMINATION CLAIM

"[A]nalysis of claims made pursuant to the Americans with Disabilities Act applies to claims made pursuant to the Ohio Revised Code § 4112.02." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010). Thus, SLH is entitled to summary judgment on Hendershott's claim of

disability discrimination in violation of Ohio state laws for the same reasons they are entitled to summary judgment in their favor on his ADA claim.

## V. CONCLUSION

For the foregoing reasons, I grant SLH's motion for summary judgment.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge